**Michael Thomas McALLISTER,
Pamela Marie McAllister,
Debtors.**

No. 01–00153–W.

United States Bankruptcy Court,
N.D. Iowa.

Aug. 21, 2001.

---

Lewis Churbuck, New Hampton, IA, for debtors.

Gary W. Koch, Michael S. Dove, Gislason & Hunter LLP, New Ulm, MN, Timothy A. Murphy, Caledonia, MN, for First Southeast Bank.

## ORDER RE MOTION TO AVOID LIEN AND MOTION TO DETERMINE VALUE OF LIEN AND DETERMINATION OF SECURED STATUS OF FIRST SOUTHEAST BANK AS TO CERTAIN PERSONAL PROPERTY

PAUL J. KILBURG, Chief Judge.

The matter before the Court is Debtors' Motion to Avoid Lien and Motion to Determine Value of Lien and Determination of Secured Status of First Southeast Bank as to Certain Personal Property. Debtors Michael McAllister and Pamela McAllister are represented by Attorney Lewis Churbuck. Creditor First Southeast Bank, Harmony, Minnesota is represented by attorneys Gary W. Koch, Michael S. Dove, and Timothy A. Murphy. The parties submitted stipulated facts and briefs for the Court's consideration. The matter was submitted as of June 26, 2001.

### STATEMENT OF THE CASE

Michael and Pamela McAllister (Debtors) bring this action to have the Court determine the priority of two creditor's security interests in an auger, planter, and trailer (hereafter "farm equipment") currently in Debtors' possession. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(K).

First Southeast Bank contests the validity of Ag Services' purchase-money security interest and asserts that its prior perfection of its security interest gives it priority status over the farm equipment. Debtors assert that Ag Services has a purchase-money security interest and therefore a superpriority over the Bank's security interest.

The Bank stipulates that Ag Services provided funds for Debtors' purchase of the farm equipment. It contends Ag Services lost its purchase-money security interest due to the contents of its security agreement or, alternatively, that Ag Services' security interest in the farm equipment never attained purchase-money security interest status.

Debtors filed a Motion to Determine Value of Lien and Determination of Secured Status of First Southeast Bank as to Certain Personal Property on April 20, 2001. The amount of Ag Services' secured claim is approximately $20,000. The amount of the Bank's secured claim at the time of filing was $219,938.10. The value of the farm equipment is approximately $6000.

### FACTS

In May 1985, Debtors executed a security agreement in favor of the Bank, granting it a security interest in all equipment owned and hereafter acquired. The Bank filed a Financing Statement with the Iowa Secretary of State on May 28, 1985. Proper continuances have been filed until present time.

Debtors and Ag Services of America entered into an Agricultural Security Agreement for the production of crops on January 16, 1998. Besides a security interest in the crops, Debtors granted Ag Services a security interest in "All of Debtors' equipment and motorized vehicles and/or trailers, whether or not required to be licensed or registered, whether now owned or hereafter acquired, including but not limited to machinery and tools, together with all accessories, parts, accessions

and repairs or hereafter attached or affixed thereto. Includes but not limited to items listed below."

Ag Services' security agreement with Debtors contained a future advances clause. The record does not contain evidence as to the amount of principal, the interest rate or the repayment due date for the crop production loan. Ag Services perfected its security interest by filing a financing statement January 23, 1998. It filed a amendment to the original financing statement January 11, 1999, to replace the legal description of the land upon which the crops were produced and to replace the equipment list.

Debtors executed a promissory note with Ag Services raising the principal balance to $112,000 on November 22, 1999. The interest rate was 21.0% with principal balance and accrued interest payable on or before January 15, 2001. The November 22 promissory note contains the clause "The security agreement(s) by which this note is secured include, but are not limited to, security agreements(s), mortgages or deeds of trust dated January 16, 1998."

The parties stipulate that Ag Services advanced funds which enabled Debtors to purchase an auger in November 1999 and a planter and trailer in January 2000. The current value of the auger is $2500. The current value of the planter and trailer is $3500.

On December 14, 2000, Debtors executed a promissory note with Ag Services increasing the principal balance to $119,000. This note is on the same form and contains the same "secured by" clause as the November 22, 1999 note. The note contains an interest rate of 21.0%, with the principal balance and accrued interest payable on or before January 15, 2002.

## PRIORITY—FIRST TO FILE

This dispute focuses on the conflicting rights of secured creditors First Southeast Bank and Ag Services. Article 9 of the Uniform Commercial Code, set forth in Iowa Code chapter 554, governs the attachment and perfection of security interests in goods. Iowa Code sec. 554.9203(1) provides that "a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless: (1) the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral . . . ; (2) value has been given; and (3) the debtor has rights in the collateral." Iowa Code § 554.9203(1) (1999).[1]

A security interest is perfected when it has attached and a financing statement has been filed or the security interest is otherwise perfected. Iowa Code §§ 554.9303(1), 554.9302(1). "If such steps are taken before the security interest attaches, it is perfected at the time when it attaches." Iowa Code § 554.9303(1). The term "attached" is used to describe the point at which property becomes subject to a security interest. Iowa Code § 554.9303 comment 1.

Where the funds are delivered by the lender for the specific purpose of purchasing equipment that is described in a prior, perfected financing statement between the parties, that security interest is a purchase-money security interest when and to the extent the funds are so used. Iowa Code § 554.9107(b); section 554.9204

---

1. Revised Iowa Code ch. 554, effective July 1, 2001, does not affect an action, case, or proceeding commenced before the Act takes effect. Iowa Code sec. 554.9702(c) (2001). All operative matters in this controversy occurred prior to the effective date of the new Article 9, and are, therefore, controlled by Article 9 in effect prior to July 1, 2001.

comment 2; *John Deere Co. v. Production Credit Ass'n*, 686 S.W.2d 904, 907 (Tenn. Ct.App.1984). Ag Services' earlier-filed financing statement perfects the subsequent security agreements. *Deutz–Allis Credit Corp. v. Lynch Farms, Inc.*, 387 N.W.2d 593, 595 (Iowa 1986). The filed financing statement gives notice to other creditors that Ag Services may claim a security interest in Debtors' equipment.

Article 9 is a notice filing system. When a conflict exists between secured creditors, the general rule provides that between creditors who perfected their security interests in the same collateral by filing a financing statement, the first in time to file their security interest has priority. Iowa Code § 554.9312(5). Iowa Code sec. 554.9312 governs the priority of security interests in the same collateral. *Citizens Savs. Bank v. Miller*, 515 N.W.2d 7, 9 (Iowa 1994). In this case both parties have perfected their security interests by filing financing statements. It is undisputed that, unless Ag Services has a purchase-money security interest, the Bank is entitled to priority under this section.

## PURCHASE–MONEY SECURITY INTEREST

The paramount exception to the first-to-file rule is the superpriority arising from a purchase-money security interest (PMSI). By definition, a security interest is a "purchase-money security interest" to the extent that it is "taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used." Iowa Code § 554.9107(b). The Iowa Supreme Court simply describes a PMSI as "a secured loan for the price of new collateral." *Farmers Co-op. Elev. Co. v. Union State Bank*, 409 N.W.2d 178, 180 (Iowa 1987).

Debtors claim that Ag Services has a PMSI and, therefore, Iowa Code section 554.9312(4) controls the priority of the conflicting security interests. Section 554.9312(4) provides that a purchase-money security interest in collateral has priority if it was perfected at the time the debtor receives possession of the collateral or within twenty days thereafter. Iowa Code § 544.9107(b). Debtors must establish Ag Services' superpriority status. *In re Relpak Corp.*, 25 B.R. 148, 152–53 (Bankr.E.D.N.Y.1982).

## TRANSFORMATION RULE

Some courts have held that purchase-money security interests are transformed into ordinary security interests under certain circumstances. This doctrine, known as the "Transformation Rule", is applied in cases involving the financing of collateral where the indebtedness has been refinanced, where the security agreement contains after-acquired property and cross-collateralization clauses and where the collateral secures later indebtedness through future advances clauses. *Borg-Warner Acceptance Corp. v. Tascosa Nat'l Bank*, 784 S.W.2d 129, 134 (Tex.Ct.App.1990).

There is a split of authority on whether refinancing through renewal or consolidation causes a purchase-money lender to lose its superpriority status. Some courts apply the transformation rule where a PMSI is automatically "transformed" into a nonpurchase-money security interest when the proceeds of refinancing are used to satisfy the original debt. *In re Matthews*, 724 F.2d 798, 800 (9th Cir.1984) (creditor sacrificed its PMSI when it made the "decision to issue a new loan, and, in its own words, to 'pay net balance due' on the old loan, rather than to extend the payments on the old loan"). This line of cases holds that the resulting lien on the purchased goods no longer qualifies as a

PMSI under section 9–107 because after refinancing, the collateral secures an antecedent debt rather than a debt for purchase of the collateral or, in the case of a renewal note consolidating debt or advancing new funds, secures more than its purchase price. *In re Short,* 170 B.R. 128, 132–33 (Bankr.S.D.Ill.1994). The refinancing does not "enable" the debtor to acquire rights in the collateral and is therefore a nonpurchase-money security interest. *Matthews,* 724 F.2d at 800; *see also In re Keeton,* 161 B.R. 410, 411 (Bankr.S.D.Ohio 1993).

Other courts hold that the PMSI status is lost if a security interest collateralizes any other debt in addition to the purchase-money debt. *In re Manuel,* 507 F.2d 990 (5th Cir.1975) (seller lost PMSI as to previously purchased items when cross-collateralized and consolidated with loan to purchase TV; court declined to rule whether TV lost its PMSI); *In re Norrell,* 426 F.Supp. 435 (M.D.Ga.1977) (invalidating the purchase-money aspect of the security agreement even as to merchandise comprising the immediate transaction).

In *Norrell,* the seller used an "add on" clause in an attempt to reserve a security interest in the items purchased plus "any subsequent purchases ... added to this contract while there is a balance due thereon." *Norrell,* 426 F.Supp. at 436. The court held that the seller did not retain a PMSI because the "loan" to debtor was secured by property other than the collateral for which the funds had been advanced. *Id.* Some courts have determined that the mere inclusion of an after-acquired property or future advances clause in the security agreement transforms a PMSI into an ordinary security interest. *Compare Southtrust Bank v. Borg-Warner Acceptance Corp.,* 760 F.2d 1240, 1243 (11th Cir.1985) (finance company's exercise of the after-acquired proper-

ty and future advances clauses in its security agreement converted its PMSI into an ordinary security interest leaving unanswered whether mere inclusion of the clauses causes the PMSI to convert into a nonpurchase-money security interest), *and In re Jones,* 5 B.R. 655, 657 (Bankr. M.D.N.C.1980) (presence of a future advances clause in the underlying security agreement was enough to extinguish the PMSI character of the security interest), *with In re Griffin,* 9 B.R. 880, 881 (Bankr. N.D.Ga.1981) (holding that the PMSI status had not been destroyed by the inclusion of future advances clause).

## DUAL STATUS

More recent opinions conclude that a security interest may have a "dual status." *In re Leftwich,* 174 B.R. 54, 58 (Bankr.W.D.Va.1994); *Pristas v. Landaus of Plymouth, Inc.,* 742 F.2d 797, 800–01 (3d Cir.1984); *In re Billings,* 838 F.2d 405, 409 (10th Cir.1988). A security interest may be partially purchase-money and partially nonpurchase-money. *E.g., Short,* 170 B.R. at 133. That is, a creditor may retain a PMSI in goods that also secure later purchases to the extent that the PMSI in the original items secures only the unpaid part of their own price. Dual status is premised on the language of Uniform Commercial Code section 9–107 which provides that a lien is a PMSI "to the extent" that it is taken to secure the purchase price of collateral. *Id.* Refinancing does not automatically destroy the purchase-money aspect of the lien. *Id.*

Debtors cite *John Deere Co. v. Production Credit Ass'n,* 686 S.W.2d 904 (Tenn. Ct.App.1984), for the proposition that the inclusion of future advances and after-acquired property clauses does not cause a PMSI to lose its superpriority status. In that case John Deere argued that PCA did not have a PMSI because its prior security

agreement contained after-acquired and future advance clauses. *Id.* at 905. The court held that PCA held a PMSI up to the amount of the value it gave for the purchase of the combine. *Id.* at 907. It concluded that a lender can be a purchase-money lender irrespective of the terms of its security agreement, to the extent that its PMSI claim is limited to the funds that it can prove were used to purchase the collateral. *Id.*

The Bank does not cite any Iowa cases. It cites the Court to 68A Am.Jur.2d *Secured Transactions* § 847 (1993) as authority for application of the "transformation rule". The American Jurisprudence is not binding authority. It merely notes that "it has been contended" that in some jurisdictions inclusion of future advances and after-acquired property clauses could cause a PMSI to lose its priority or "at least giv[e] it a dual nature, divided between the purchase-money and other portions of the financing." *Id.*

It is the conclusion of this Court that the "dual status" doctrine is properly applied in this case. Application of this doctrine allows the inclusion of after-acquired and future advances clauses. *See In re Hassebroek,* 136 B.R. 527, 530 (Bankr.N.D.Iowa 1991) (determination of whether consolidation causes creditor to lose its PMSI status). "Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment." Iowa Code § 554.9204(3). Section 554.9204 comment 5 reveals that after-acquired property and future advance clauses were meant to be a useful tool in commercial finance and harsh restrictions should not be placed on their use. *In re Estate of Simpson,* 403 N.W.2d 791, 792 (Iowa 1987).

This court's application of the "dual status" doctrine is consistent with recent case law. Courts in this Circuit, like Iowa, apply the "dual status" doctrine. *See In re Hemingson,* 84 B.R. 604, 606 (Bankr. D.Minn.1988); *In re Win-Vent, Inc.,* 217 B.R. 803, 811–12 (Bankr.W.D.Mo.1997), *aff'd,* 217 B.R. 798 (W.D.Mo.1997); *In re Wiegert,* 145 B.R. 621, 623 (Bankr.D.Neb. 1991). The new Article 9 revision adopts the dual status doctrine. Revised U.C.C. section 9–103(f) (2001) provides that "[A] purchase-money security interest does not lose its status as such, even if: (1) the purchase-money collateral also secures an obligation that is not a purchase-money obligation; (2) collateral that is not purchase-money collateral also secures the purchase-money obligation; or (3) the purchase-money obligation has been renewed, refinanced, consolidated, or restructured."

## REFINANCING

■ Although inclusion of future advances and after-acquired property clauses does not transform a PMSI into a nonpurchase-money security interest, refinancing may cause a creditor to lose its PMSI status. *In re Butler,* No. 86 01651C, 1987 WL 46571, at *1 (Bankr.N.D.Iowa, May 28, 1987). The Bank does not raise this issue. However, the Court feels it appropriate to review the record to determine whether the 1999 and the 2000 promissory notes cause Ag Services to lose its PMSI in the contested equipment.

■ Refinancing occurs when an existing note is renewed and new credit is extended. *Butler,* 1987 WL 46571 at *2. Common characteristics of refinancing include: 1) an extension in the time of payment, 2) a consolidation of notes, and 3) an extension of new credit with or without additional security. *Id.* at *2. Refinancing a loan can be determined to be (1) a renewal of the original purchase-money obligation, in which case the PMSI survives, or (2) a novation which extinguishes

the purchase-money character of the loan. *Short,* 170 B.R. at 134. A novation occurs when the "purpose of the note was to pay off the original note, an antecedent debt." *Eitzen's Estate v. Lauman,* 231 Iowa 1169, 3 N.W.2d 546, 550 (Iowa 1942). Article 9 does not address the effect of refinancing or consolidation on PMSI status. Determining whether Ag Services' third security agreement extinguishes the PMSI on the collateral purchased under the second security agreement depends on a court determination of whether the second and third notes represent a novation. *Butler,* 1987 WL 46571, at *2.

■ This court has addressed the issue. *Compare In re Averhoff,* 18 B.R. 198 (Bankr.N.D.Iowa 1982) (novation found where each subsequent note advanced new money, increased debtor's payments, provided additional collateral for security, and introduced a new security agreement for each renewal), *with In re Fricke,* No. L91–01056W, slip op. at 5 (Bankr.N.D.Iowa. Oct. 22, 1991) (novation not found even though debt was not perfected until consolidation of three notes), *and Butler,* 1987 WL 46571 (intent to extinguish the original security agreement and substitute the new ones for the antecedent debt was not proven). The primary consideration of whether refinancing constitutes a novation is the "intent" of the parties. *Butler,* 1987 WL 46571, at *3.

■ Various factors are considered to determine whether the parties intend a novation. They include: (1) whether new money was advanced to the debtors, (2) whether the amount of the monthly payments increased, (3) whether a new security agreement was introduced, and (4) whether additional collateral was provided to secure the creditor's security interest. *Hassebroek,* 136 B.R. at 530. A novation is not presumed. *Id.* The greater the degree of change in the obligation, the

more likely a novation will be found. *Short,* 170 B.R. at 134. "Tolerance of 'add-on' debt and collateral provisions, properly applied, carries out the approbation for purchase-money security arrangements and simplifies repeat transactions between the same buyer and [lender]." *Hemingson,* 84 B.R. at 607.

■ It is the conclusion of this Court that the subsequent promissory notes executed by Ag Services and Debtors were intended as "add on" transactions extending the loan limit. The advances were not made with the intent of paying off the earlier debt. Execution of each subsequent promissory note did not precipitate execution of a new security agreement which was meant to substitute for the prior security agreements. *Butler,* 1987 WL 46571 at *3. The promissory notes, dated November 22, 1999 and December 14, 2000, establish that the prior security agreement was to remain in effect by inclusion of the clause: "The security agreement(s) by which this note is secured include, but are not limited to, security agreements(s), mortgages or deeds of trust dated January 16, 1998."

The promissory notes do not evidence a new beginning but rather a continuance of a prior agreement. The 21.0% interest rate is consistent in both the November of 1999 and December of 2000 agreements. Without evidence to the contrary as to the repayment date for the original loan, the Court concludes that the January 15, 2001 repayment date, set as the repayment date in the November 22, 1999 security agreement and extended one year by the December 14, 2000 security agreement, correlates to the repayment date set in the January 16, 1998 loan. It is clear from the record that the advances had no effect on monthly payments. The phrase: "Said principal and accrued interest to be due

and payable in full on or before" indicates repayment in one lump sum.

■ The Bank has the burden to establish that each subsequent agreement represents a novation. *Butler*, 1987 WL 46571, at *3. This Court concludes that the subsequently executed promissory notes do not extinguish the prior security agreement but rather represent "add ons" to the total amount of principal Debtors could borrow.

## DESCRIPTION OF COLLATERAL

In addition to its theory concerning the superpriority status of Ag Services, the Bank argues an alternative theory. It asserts that Ag Services never had a PMSI because its security agreement does not specifically describe the collateral for which it claims a PMSI. One of the formal requirements of a valid security agreement is that it must contain a description of the collateral. Iowa Code § 554.9203(1)(a). Iowa Code section 554.9110 provides: "any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described."

■ Security agreements, and thus promissory notes, are not intended to give notice to third parties but rather provide evidence of an agreement and serve a statute of frauds function as between the creditor and debtor. *First State Bank v. Shirley Ag Servs., Inc.*, 417 N.W.2d 448, 451 (Iowa 1987); *In re Product Design & Fabrication*, 182 B.R. 803, 806 (Bankr. N.D.Iowa 1994). The test of sufficiency of the description of collateral in a security agreement is that the description must make possible the identification of the thing described. *First State Bank v. Waychus*, 183 N.W.2d 728, 730 (Iowa 1971).

■ Advances may be secured by reference to a perfected security agreement that contains a future advance clause if the purchase was of the same type of collateral identified in the perfected security agreement. *Simpson*, 403 N.W.2d at 793 (note secured by real estate mortgage was not secured by future advances clause in perfected security agreement where neither note nor mortgage referred to prior agreement). Collateral may be described by means of incorporation by reference to other identifiable documents that describe the collateral. *In re Nickerson & Nickerson, Inc.*, 452 F.2d 56 (8th Cir.1971); *Product Design*, 182 B.R. at 806. The January 16, 1998 security agreement includes future advances and after-acquired property clauses. The advances made by Ag Services, under the November 22, 1999 and the December 14, 2000 promissory notes refer to and are secured by the prior security agreement perfected January 16, 1998.

■ The January 16, 1998 security agreement adequately describes the disputed equipment. In describing after-acquired property in security agreements, general descriptions must be accepted. *In re Sunberg*, 35 B.R. 777, 782 (Bankr. S.D.Iowa 1983), *aff'd*, 729 F.2d 561 (8th Cir.1984). The auger, planter, and trailer are within the category of collateral secured by the January 16, 1998 security agreement. The January 16, 1998 agreement is an Agricultural Security Agreement that secures an interest in property "now owned or hereafter acquired, including but not limited to machinery and tools."

## EXTENT OF PURCHASE–MONEY SECURITY INTEREST

■ The remaining issue is to determine the extent of Ag Services' PMSI. The difficulty with the dual status rule lies in determining how payments have been allocated and what portion of the debt is

purchase-money. *E.g., Hassebroek*, 136 B.R. at 531. If that allocation can be made, the PMSI does not convert to an ordinary security interest. *In re Slay*, 8 B.R. 355, 358 (Bankr.E.D.Tenn.1980). If the security agreement is silent as to how payments are to be allocated, some courts look to state law for a formula while others impose a judicial "first-in first-out" rule, or "FIFO". *Pristas*, 742 F.2d at 801.

■ Iowa follows the first-in first-out method. *In re Butler*, 1987 WL 46571, at *2 (Bankr.N.D.Iowa, May 28, 1987); *Hassebroek*, 136 B.R. at 531. Other states in the Eighth Circuit also follow the first-in first-out method. *In re Hemingson*, 84 B.R. 604, 606–07 (Bankr.D.Minn.1988); *In re Wiegert*, 145 B.R. 621, 623 (Bankr. D.Neb.1991). The burden is on Debtors to provide evidence that will allow the Court to trace their payments to Ag Services. *Short*, 170 B.R. at 135.

The FIFO method allocates payments first to the unpaid amount of the oldest purchase and then sequentially to the remaining debts in the order in which they were incurred, retaining a valid PMSI in items which have not been paid in full. *Wiegert*, 145 B.R. at 623–22. The purchase price includes the cost of the item and any financing charges and sales taxes attributable to that item. *Short*, 170 B.R. at 136. A general security interest is retained in the paid-in-full collateral. *Id.*

The Bank stipulates that Ag Services provided funds for the three pieces of equipment. This obviates the need for Debtors to provide evidence which demonstrates that they received funds from Ag Services which they in fact used to purchase the farm equipment. However, the record is insufficient to determine what portion of Ag Services' $20,000 claim originally represented purchase-money and what portion of the funds retain PMSI status. Using the FIFO method to allocate payments, it is possible that some of the equipment for which Ag Services originally had a PMSI, has been paid in full. Once the purchase price of a particular item has been fully paid, the security interest in that item becomes a nonpurchase-money security interest. *Short*, 170 B.R. at 136.

## CONCLUSION

Iowa follows the dual status doctrine for purchase-money security interests. Under Iowa law, the inclusion of after-acquired property and future advances clauses in security agreements, does not "transform" a PMSI into a general security interest. Ag Services' PMSI in the equipment arose from the promissory notes referring back to the January 16, 1998 security agreement for which a financing statement was filed with the Secretary of the State on January 23, 1998.

The record is insufficient for the Court to determine what, if any, equipment has been paid in full and what debts are accounted for in Ag Services' $20,000 claim. An additional hearing is necessary to allow Debtors an opportunity to provide sufficient evidence to allow the Court to make the required calculations. If Debtors are unable to sustain this burden, insufficient payment records could result in a loss of all purchase-money security interests.

**WHEREFORE,** the Court concludes that the dual status doctrine applies in this case.

**FURTHER,** Ag Services' PMSI was created by promissory notes referring back to the January 16, 1998 security agreement which was perfected by filing a financing statement.

**FURTHER,** an additional evidentiary hearing is necessary to determine the extent of the PMSI.

**FURTHER,** this shall be determined by application of the FIFO method as set out in this opinion.

**FURTHER,** the burden is upon Debtors to provide sufficient payment data to establish Ag Services' PMSI.

**FURTHER,** a scheduling conference shall be set by separate order.